IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | 2:14-CR-0080 |
| | § | |
| JASON AGUILERA | § | |

### REPORT AND RECOMMENDATION
### TO DENY DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

Came for consideration the motion to suppress, filed November 17, 2014, by defendant JASON AGUILERA. By this Motion defendant seeks to suppress evidence of the narcotics found in the vehicle he was driving when he was stopped for a traffic violation. An evidentiary hearing on defendant's motion was held November 25, 2014. After consideration of the evidence presented at the hearing, the pleadings of record, and controlling case law, the undersigned United States Magistrate Judge is of the opinion defendant's motion to suppress should be DENIED.

I.
FACTS

The facts[1] relevant to the issues before the Court are summarized below:

On Tuesday, September 23, 2014, Danny Dawson, an investigator for the 100th Judicial District Attorney's Office, was patrolling the east-bound lanes of Interstate 40 in Carson County,

---

[1] The factual background is merely a summarization of the evidence presented at the evidentiary hearing and is not intended to be a complete, verbatim recitation of all of the testimony and/or evidence. If the parties believe a more detailed summary of the evidence is necessary for a determination of this motion, they should provide a transcript of the hearing.

Texas. Dawson was in uniform, in a marked police unit, and was working what he described as interdiction. Dawson observed a Nissan Rogue with California license plates committing two traffic violations: (1) following a tractor trailer at an unsafe distance in violation of Texas Transportation Code § 545.062 and (2) driving in the left lane while not passing. Dawson activated his emergency lights and made a traffic stop of the vehicle at approximately 6:11 p.m. near mile-marker 110. Dawson exited his patrol car and approached the defendant's vehicle. Defendant Aguilera exited his vehicle, and, as he did, Dawson motioned for Aguilera to meet him at the rear of the Nissan. Dawson testified that as Aguilera got to the back of the vehicle, he faced the rear of his vehicle, turning his back to Dawson and began to place his hands behind his back, a movement that Dawson said roused his suspicion because Dawson believed it indicated Aguilera expected to be handcuffed. Aguilera handed his driver's license to Dawson and then went toward the passenger's side to retrieve the vehicle rental agreement. Dawson testified that as he followed Aguilera towards the front passenger door, he spotted a "shrine" on the floor of the back seat of the vehicle. Dawson explained, based upon his experience working in drug interdiction in south Texas, he knew drug traffickers to utilize such shrines for good luck. Dawson also testified that he noticed an open box of Tide laundry detergent in the rear of the vehicle, and observed laundry detergent out of the box sprinkled around the cargo area of the vehicle, and that this observation roused his suspicion because he considered the detergent may have been used as a "masking agent" to prevent detection of narcotics.

Dawson examined the rental agreement and noticed the vehicle was rented by a Margarita Ortiz, a person not traveling with defendant. Dawson further noted the vehicle was rented from the

Los Angeles airport at a price of $1,141.79, but did not notice any additional drivers listed.[2] Dawson then questioned Aguilera at the front of his patrol car regarding the logistics of his trip and his relationship with the passenger of the car. Dawson instructed Aguilera to remain in front of the patrol car as he moved to the passenger window and asked similar questions of the passenger.

After questioning the passenger, Dawson had Aguilera sit in the front passenger seat of the patrol car while Dawson ran a drivers license and criminal record check on Aguilera. While those record checks were running, Dawson asked Aguilera questions regarding the purpose of his trip, the trip itinerary, the length of his relationship with the passenger, and his relationship to Margarita Ortiz, the renter of the vehicle. Dawson questioned Aguilera regarding his criminal history. Initially, Aguilera said he had never been arrested. Once the criminal background check was returned, Dawson further questioned Aguilera about his arrest record and Aguilera admitted to a juvenile arrest for fighting. When asked whether he had been arrested for drugs, Aguilera said he had not been arrested. Dawson asked Aguilera if he had ever been ticketed, and Aguilera replied that he had been ticketed for marijuana. At approximately 6:22:09 according to the time stamp on the in-car camera, approximately eleven minutes into the traffic stop, Dawson handed the warning citation to Aguilera, along with the rental agreement, simultaneously informing Aguilera that the citation was just a warning, carried no fines or penalties, and would not go on Aguilera's driving record. Dawson retained Aguilera's driver's license, shifted the driver's license from one hand to the other hand, the one closest to Aguilera, and held the license with his arm supported by the top of his closed computer, located in the center of the car. While holding the license, at approximately 6:22:11, Dawson asked Aguilera if he was carrying any of a list of contraband. After Aguilera

---

[2] Defendant Aguilera had been added as an additional driver.

denied possessing any contraband items, Dawson, while holding the driver's license, asked for consent to search Aguilera's vehicle, saying "mind if I take a look in the car" while pointing to the vehicle with Aguilera's driver's license. At 6:22:19 Aguilera consented to the search, Dawson then returned the license, saying "let me get you that" at approximately 6:22:20.

Dawson proceeded to search the vehicle and found several bundles of heroin hidden in the door panels of a back door of the car. Upon discovering the heroin both defendant Aguilera and the passenger were placed under arrest.

## II.
## ISSUES

The issues presented are:

1) Whether the traffic stop of defendant Aguilera's vehicle was valid and if so, was his detention lawful up until the time he gave consent to search, and

2) Was defendant Aguilera's consent to search voluntarily given.

According to the video of the traffic stop (Government's Exhibit 1), the traffic stop occurred at 6:11:00. Approximately 11 minutes later, at 6:22:09, defendant Aguilera was given the warning ticket and rental agreement, but not his driver's license. At 6:22:19, defendant consented to the search of his vehicle and at 6:22:20, officer Dawson gave defendant his license back.

Two scenarios are presented in regard to the suppression issue.

First, if the ten-second detention from 6:22:09 to 6:22:19 was an unlawful detention/seizure, then, before the evidence can be admissible, the consent to the search must have been both voluntary and the result of an independent act of free will such that the consent was not a product of an illegal detention.

Second, if reasonable suspicion had been developed prior to 6:22:09, and the ten-second detention was not illegal, then the government need only show the consent to have been voluntary under the totality of the circumstances. No showing that the consent was an independent act of free will is necessary.

There is no issue and the government does not argue that the encounter between defendant Aguilera and Investigator Dawson had become a purely consensual encounter. Further, the evidence and testimony from Investigator Dawson does not indicate the encounter ever became consensual.[3] Instead, Investigator Dawson's testimony was that reasonable suspicion had developed prior to issuance of the warning ticket.

### III.
### PROLONGED DETENTION

Courts analyze the legality of traffic stops for Fourth Amendment purposes under the standard articulated by the Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *United States v. Pack*, 612 F.3d 341, 349-50 (5th Cir. 2010) (citing *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004)). Under this standard, the court is required to make a two-part inquiry. *Id.* at 350. First, the court examines whether or not the officer's decision to stop the vehicle was justified at its inception. *Id.* Second, the court must determine whether or not the officer's subsequent actions were reasonably related in scope to the circumstances that caused him to stop the vehicle in the first place. *Id.* An officer's subsequent actions are not reasonably related in scope to the circumstances that caused the officer to stop the vehicle if the officer detains its occupants beyond the time needed to investigate the circumstances that caused the stop, unless the

---

[3] Had Investigator Dawson returned Aguilera's driver's license and had Aguilera been free to leave, the situation could be considered a consensual encounter.

officer develops reasonable suspicion of additional criminal activity in the meantime. *Id.* If the officer develops reasonable suspicion of additional criminal activity during the investigation of the circumstances that originally caused the stop, the officer may further detain the occupants for a reasonable time while appropriately attempting to dispel this reasonable suspicion. *Id.*

The Fifth Circuit has held that an officer may examine driver's licenses and vehicle registrations and run computer checks as part of the investigation of the circumstances that originally caused the traffic stop. *Id.* The officer may also ask about the purpose and itinerary of the occupants' trip as part of this investigation, because these questions are considered to be reasonably related in scope to the investigation of the circumstances that caused the stop. *Id.* Additionally, the Fifth Circuit has held that an officer may ask questions on subjects unrelated to the circumstances that caused the stop, so long as these unrelated questions do not extend the duration of the stop. *Id.* (Citing *United States v. Shabazz*, 993 F.2d 431, 436–37 (5th Cir. 1993)). The reasoning behind this rule is that the Fourth Amendment protects against detention, not questioning. *Id.* Thus, no Fourth Amendment harm is done where the officer asks the occupants of a vehicle questions that are unrelated to his reason for stopping the vehicle while waiting for routine computer checks to be processed. *Id.*

Defendant argued at the hearing and appears to argue in his supplemental brief, that while a stop could be prolonged based upon reasonable suspicion, any such prolonging of the stop must occur before the conclusion of the investigation of the purpose of the original stop. In support of this proposition, defendant cites *United States v. Dortch*, 199 F.3d 193 (5th Cir. 1999) and *United States v. Jones*, 234 F.3d 234 (5th Cir. 2000). It is true that in both *Dortch* and *Jones* the evidence was suppressed because the detention continued beyond the time necessary to investigate the initial

purpose of the stop, but in both cases no reasonable suspicion existed for any extension of the stops. *United States v. Brigham*, 382 F.3d 500, 510 (5th Cir. 2004). In cases where reasonable suspicion does exist, and the basis for that reasonable suspicion has not yet been fully investigated, a detention can continue past the completion of the purpose of the initial traffic stop for a *reasonable* time to investigate the suspicion. *Id.* Defendant seems to argue that extending the stop in order to perform a free-air sniff would be constitutional if there were reasonable suspicion; but, because no sniff was performed, the detention of defendant Aguilera for the ten seconds after the traffic stop was over was unconstitutional. Defendant's Supp. Brief at 4 ("Thus, it is irrelevant what actions Dawson may have taken if "consent" had not been obtained, based upon his 'reasonable suspicion' of criminal activity."). The Court does not agree. If developed, reasonable suspicion allows for the continued detention of a defendant in order to investigate the suspected criminal activity. If the officer has reasonable suspicion to believe such criminal activity is present, the officer's investigation is not limited to a certain manner or method of investigation. If Dawson had reasonable suspicion to believe additional criminal activity was occurring, he was entitled to detain defendant Aguilera while he conducted a reasonable investigation either confirming or dispelling his suspicion. The Court has not been directed to any precedent which would have required Dawson to immediately use the drug dog after issuance of the warning instead of using the drug dog after asking for consent, if consent had been refused. The officer, in seeking to dispel his reasonable suspicion, was constitutionally permitted to do so by searching pursuant to consent, or by using the drug dog. The manner of the investigation is not relevant so long as such investigation is reasonable.

The first part of the two-part Terry inquiry is not at issue in this case. There is no challenge

to the traffic stop of defendant Aguilera for following too closely and driving in the left lane without passing, and Dawson's stop was justified at its inception. *See, e.g., Shabazz*, 993 F.2d at 435 (5th Cir.1993) ("Appellants do not argue, nor could they, that the initial stop of their vehicle for speeding was improper."). The Government argues that the second part of the Terry inquiry was also satisfied. It argues that the facts which emerged during Dawson's investigation of Aguilera's following-too-closely offense were sufficient to create reasonable suspicion that Aguilera was engaged in additional criminal activity, justifying Dawson's decision to continue to detain Aguilera. In order for such continued detention to be valid, the officer must have had reasonable suspicion, defined as "'a particularized and objective basis' for suspecting wrongdoing," expressed through articulable facts supporting that suspicion. *Pack*, 612 F.3d at 356 (quoting *United States v. Arvisu*, 534 U.S. 266, 273, 122 S.Ct. 744, 750 (2002)).

   The government has set out a list of reasons it believes justifies Dawson's continued detention of Aguilera for the ten seconds after the completion of the initial purpose of the traffic stop. The first of these, that Dawson's expertise and experience in finding drug traffickers, however, is not a free-standing reason for reasonable suspicion, as the government seems to contend. An officer's experience and expertise are a consideration and may validate the officer's interpretations of other, independent facts that an ordinary citizen might not consider significant. Justifying reasonable suspicion based upon an officer's expertise alone, however, is little more than a license for an officer to detain a suspect based upon a hunch. Reasonable suspicion must be based upon articulable facts, not "mere hunch[es]." *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883. While the remainder of Dawson's observations during the traffic stop are informed by his experience, Dawson's experience is not, by itself, an independent supporting factor.

Second, the government claims I-40, the highway on which Aguilera was traveling, is a well known drug corridor. As the government points out in its brief, the Fifth Circuit has found that traveling on a known drug corridor, when used as one of several factors can support reasonable suspicion. *See Pack*, 612 F.3d at 361.

Third, the government contends Aguilera's explanation of the purpose of his trip was suspicious. Aguilera stated he was traveling to Connecticut to visit his mother. The stop occurred on September 23, 2014, in Texas, which is a significant distance from Connecticut. The vehicle was due to be returned less than three days later, on September 26, 2014, to the Los Angeles Airport.[4] Although defendant Aguilera said he and his girlfriend were flying back to Los Angeles from Connecticut, they did not appear to have any flight plans, and the rental agreement had not been changed to drop off the car in Connecticut, although it had been changed the day before the stop to add defendant Aguilera as a driver.

Fourth, Dawson testified that as he initially looked into the vehicle, he spotted an open box of laundry detergent in the back of the SUV, and laundry detergent was sprinkled on the floor of the back of the SUV. Dawson testified he knew from experience that drug traffickers often use masking agents, such as laundry detergent, to conceal the smell of narcotics.

Fifth, Dawson testified he noticed a "shrine" on the floor of the back seat of defendant Aguilera's vehicle. Dawson testified that he had seen similar shrines used by drug traffickers during his time working in drug interdiction in south Texas.

In its sixth point, the government makes two arguments. First, the government points out

---

[4] The vehicle was due back at 2:30 p.m. on September 26, 2014 in Los Angeles, California and the traffic stop in Texas was at 6:11 p.m. on September 23, 2014.

the vehicle was rented to Margarita Ortiz, who was not present in the car at the time of the stop. Second, Dawson testified that the high price of the rental, over $1,100.00, was unusual and aroused his suspicion.

Seventh, Dawson testified that Aguilera exhibited signs of extreme nervousness, such as failing to make eye contact, exhibiting a rapid heartbeat as demonstrated by his pulsating carotid artery, a trembling right eye, and rapid chewing of gum. Dawson also testified that the female passenger seemed nervous, as demonstrated by her carotid artery. Dawson testified that in his experience, particularly once he tells someone they will only receive a warning, their nervousness subsides, but defendant Aguilera's nervousness did not ever subside. Defendant Aguilera's continued visible nervousness increased Dawson's suspicion.

Eighth, the government argues Los Angeles, California where Aguilera began his trip, was a source city for narcotics, which also increased Dawson's suspicion.

Lastly, Dawson testified that Aguilera's denial of a previous arrest aroused his suspicion because Aguilera had past arrests. As pointed out by defendant on cross-examination, however, Aguilera admitted to prior arrests but stated his belief that such arrests occurred while Aguilera was a juvenile. The government did not offer any evidence relating to any prior arrests.

As discussed in more detail below, the Court, upon consideration of these factors, finds there was reasonable suspicion to believe additional criminal activity existed. The Court further finds such reasonable suspicion had developed during the lawful traffic stop and prior to the time when the rental papers and the warning ticket were given to defendant Aguilera.

The fact that Interstate Highway 40 is a narcotics trafficking corridor is not challenged. Additionally, Dawson's knowledge and belief that Los Angeles, California was a narcotics source

city is unchallenged.

The extreme nervousness Dawson observed from defendant Aguilera is subjective and not readily apparent from the video. Nonetheless, Dawson's testimony to that fact was firm, and the Court cannot, from the video alone, determine that such extreme nervousness was not exhibited. This is one of those factors which is determined in large part based upon the officer's experience. While the Court does not consider the defendant's and the passenger's statements regarding their relationship and their trip to be contradictory, the trip itself was suspicious. The rental vehicle was due to be turned in Los Angeles, California on September 26, 2014. Defendant was en route to Connecticut and was stopped in Texas on the evening of September 23, 2014. Even if defendant Aguilera, contrary to the rental agreement, intended to return the vehicle in Connecticut instead of California, he had no specific plans regarding his return to California. From an economic standpoint, Investigator Dawson's suspicions about the cost of the rental and additional charges to return the vehicle in Connecticut were not unfounded.

The open box of laundry detergent, the detergent Dawson observed sprinkled around the cargo area, and the "shrine" are critical to the finding of reasonable suspicion and fully support Dawson's conclusion. While these items might be of little significance to the general public, they were of great significance to Dawson based upon his training and experience.

All of the factors identified support the determination that reasonable suspicion of additional criminal activity existed. Reasonable suspicion being present, then the detention of defendant Aguilera for the additional ten seconds after the issuance of the warning ticket was lawful. The remaining issue is whether defendant Aguilera's consent is voluntary.

IV.
CONSENT

To determine whether defendant's consent was valid, this Court must determine whether consent was voluntary. To determine whether consent was voluntary, this Court must consider (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. *United States v. Jones*, 234 F.3d 234, 242 (5th Cir. 2000). The Court must consider all of these factors and no one factor is determinative. *Id.* The government bears the burden of proving consent was voluntary. *See id.*

1. <u>Custodial status</u>

The defendant had not been arrested, nor had he been handcuffed. Investigator Dawson had advised defendant Aguilera he would be issuing a warning, and had told him he would be free to go after the warning was issued. While Dawson testified that he had, in his opinion, developed reasonable suspicion, and that absent consent, defendant Aguilera would continue to be detained until a free air sniff by the drug dog was conducted, Dawson had not informed defendant Aguilera of the fact that he intended to have the dog conduct a free-air sniff. Indeed, during the conversation in the patrol car, Investigator Dawson informed defendant Aguilera that he would be in Oklahoma in about four hours. From defendant Aguilera's viewpoint, his detention was the same as that which any other motorist experiences while being issued a citation.

The consent by defendant Aguilera was not given during a consensual encounter; but, neither was it given during a custodial interrogation. Instead, consent was given during a temporary

detention.

   2.   <u>Coercive police procedures</u>.

Dawson did not raise his voice to defendant or threaten him in any way. Instead, the officer was polite throughout the encounter. There were no intentional coercive police procedures utilized over and above the temporary detention resulting from a normal traffic stop. Nothing intimidating was said and the tenor of the conversation between the officer and Aguilera was not confrontational. Aguilera and Dawson conversed freely about Aguilera's living arrangements and relationship with his girlfriend.

   3.   <u>Defendant's cooperation</u>.

Defendant Aguilera was cooperative. Although nervous, he complied with each request made by the officer during the encounter, and freely provided information in response to questioning. Defendant was talkative, volunteering some information, and did not demonstrate hostility or fear in any way.

   4.   <u>Awareness of right to refuse consent</u>.

There was no testimony concerning whether defendant did or did not know, at the time he gave consent, that he could refuse consent, limit consent, or withdraw consent. While there was no evidence or testimony that defendant was not aware that he could refuse consent, Dawson, did not utilize a consent form advising defendant of his right to refuse, nor did Dawson verbally advise defendant of his right to refuse consent. Dawson did, however, ask for consent by saying "mind if I take a look in the car, you alright with me checking it," which certainly could indicate the defendant had a choice whether or not to consent to the search. In the end, however, there is no direct evidence establishing defendant Aguilera was aware of his right to refuse consent; and, there is no direct

evidence from defendant Aguilera that he was not aware.

5. <u>The defendant's education and intelligence</u>.

While no evidence was presented regarding defendant's intelligence or level of education, the video of the encounter provides no reason to believe defendant's intelligence level was diminished or impaired in any manner.

6. <u>The defendant's belief no incriminating evidence will be found</u>.

Considerable effort was taken to conceal the illegal narcotics. The contraband was hidden inside of the hard plastic lining of the back driver's-side door. Given how well the drugs were hidden, it is entirely possible Aguilera believed no incriminating evidence would be found.

After consideration of all of the factors and evidence outlined above, it is the opinion and finding of the court that factors 2 (coercive procedures), 3 (defendant's cooperation), 5 (defendant's education and intelligence), and 6 (defendant's belief no narcotics will be found) all weigh in favor of the Government. Factor 4 (defendant's awareness of his right to refuse) weighs in favor of defendant Aguilera. Factor 1 (custodial status) does not *clearly* favor either the Government or the Defendant. The encounter was not consensual, which weighs in favor of the defendant. Neither, however, was it custodial, which weighs in favor of the government. Had defendant Aguilera's drivers license been returned prior to asking consent, the case would not appear at all close and the consent would have been clearly voluntary. Since the driver's license was not returned, the issue is closer, but based upon all of the evidence and the totality of the circumstances, defendant Aguilera's temporary detention was no more onerous than that endured by every motorist who is stopped for a

traffic infraction.[5] Factor number 1 weighs marginally in favor of the government

Based on this evidence, the undersigned finds defendant's consent was voluntary. Defendant had at all times been cooperative and seemed to understand and be able to communicate with Dawson. The detention itself was relatively short, only lasting for approximately eleven minutes before consent was given. To the extent the detention extended beyond the time necessary for Officer Dawson to investigate the initial reason for the stop (running the driver's license), the stop was extended by a mere eleven seconds and was lawful since reasonable suspicion had been developed. The drugs were well hidden, and were hidden to the degree that Aguilera very well could have believed the narcotics would not be discovered during a search.

As noted above, the consent in this case was provided during a valid detention. Because Dawson had reasonable suspicion, the consent was not given during an illegal detention. As the consent was not given during an illegal detention, the Court is not required to make any further determination whether the consent was an independent act of free will so as to determine if there is a break in the causal chain between a constitutional violation and the consent. *See United States v. Jenson*, 462 F.3d 399, 407 (5th Cir. 2006). Because the consent to the search was voluntary, the consent was valid, and, the evidence should not be suppressed.

## VIII.
## RECOMMENDATION

It is the RECOMMENDATION of the United States Magistrate Judge to the United States District Judge that the motion to suppress filed by defendant JASON AGUILERA be DENIED.

---

[5]The Court recognizes the significance the case law places on the return of a driver's license or rental papers to a motorist before asking for consent. As a practical matter, however, it seems the average motorist does not feel free to leave until the officer in some manner indicates he has finished the business related to the traffic stop.

IX.
## INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to forward a copy of this Report and Recommendation denying the motion to suppress to defense counsel and to the Assistant United States Attorney by the most expedient means available.

IT IS SO RECOMMENDED.

ENTERED this 19th day of December 2014.

_____
CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

## * NOTICE OF RIGHT TO OBJECT *

Any party may object to this Report and Recommendation. *See* 28 U.S.C. § 636. This case is set for docket call on Monday, January 5, 2015, and trial on Tuesday, January 6, 2015. Therefore, all objections must be filed by **Monday, December 29, 2014.** Any such objections shall be in writing and shall specifically identify the portions of the findings, conclusions, or recommendation to which objection is made, and set out fully the basis for each objection. Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on the Magistrate Judge and all other parties. A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions set forth in this report and accepted by the district court. *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).